IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TEXAS MOTOR COACH, L.C., ET AL. | § | |
| | § | |
| VS. | § | CASE NO. 4:05cv34 |
| | § | (Judge Schneider/Judge Bush) |
| BLUE BIRD BODY COMPANY | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Texas Motor Coach L.C. ("Texas Motor") and Bill Retherford filed this action against Blue Bird Body Company ("Blue Bird") in state court. Retherford is the president of Texas Motor. Blue Bird removed the proceeding to this Court. The Court has diversity jurisdiction. Texas Motor sued for breach of contract, fraudulent inducement, fraud, violations of the Texas Deceptive Trade Practices Act, TEX. BUS. & COM. CODE ANN. § 17.45 *et. seq*., and negligent misrepresentation. Texas Motor seeks actual as well as punitive damages and attorneys' fees.

Texas Motor sets forth the following allegations in its Amended Complaint: In 2002, Texas Motor and Blue Bird began negotiations for acquiring an exclusive franchise dealership for the Blue Bird Wonderlodge line of recreational vehicles. Prior to the commencement of negotiations, Bryan Hayes and Ronnie Lamb, employees and/or agents of Blue Bird, came to Texas Motor's place of business in Denton, County, Texas to demonstrate the prototype of Blue Bird's thirty-eight foot recreational vehicle, the M-380. Retherford was well aware of the "past reputation" of the Blue Bird products. However, the prototype shown to Texas Motor's agents at that time had defects. Texas Motor's principals believed these defects to be indicative of the fact that the model shown was represented to them as a prototype and that, of course, such issues would be addressed in the

1

production of the final product.

Retherford and others at Texas Motor were aware through various channels that the Blue Bird Wonderlodge line had fallen from its lofty status at the time of the initiation of the negotiations for the franchise dealership agreement.  They  were aware that changes had been made in the manner in which Blue Bird Wonderlodge units had been constructed.  This lack of quality and manner of construction resulted in the decline of reputation set forth above.  Retherford and other were cautious in their commitment due to this decline and made an effort to examine all options available regarding a possible franchise ownership.

As a result of the large financial exposure and the goals of Texas Motor's principals, Texas Motor sought alternatives to the Blue Bird franchise.  After review of available alternatives, the decision was made nevertheless to pursue the Blue Bird franchise, as the Wonderlodge product had been presented to them as the "Lexus" of recreational vehicles.  A meeting was held in Denton, Texas between Texas Motor's principals and Richard Maddox and Bryan Hays, employees and/or agents of Blue Bird regarding the type of production to be expected.  Texas Motor's principals were told that a new factory had been built, new engineers had been hired, Japanese-type production would be employed by Blue Bird, no further application of the school bus chassis would occur, and the ISO 9000 standards would be met.  These representations further included a commitment to the franchise dealership through advertising for the benefit of dealers, rallies, technical support, cost containment, product improvement, dedication to customer satisfaction, and a reduction of manufacturing defects.  Other representations were made concerning on-site training schools, training, and that Blue Bird considered the end customer to be "king."

Relying on these representations, Texas Motor made the decision to enter into the franchise

agreement with Blue Bird and construct improvements upon real property not owned by either Texas Motor or Retherford.  Texas Motor obtained the necessary licensing and authority from the State of Texas to operate the franchise.  Retherford traded all stock owned by him in a separate legal entity in exchange for the improvements upon the real property owned by that separate legal entity.  In the event no profits were made by Texas Motor, the improvements would then revert to the ownership of the separate legal entity.  Texas Motor obtained the necessary floor plan financing to operate the franchise, and expended funds on advertising.  Texas Motor also built dealership infrastructure, including twenty parking bays., and expended time, effort and funds in interviewing individuals for hire at the franchise dealership, as well as payroll expenses.

In January 2004, Texas Motor received what were purportedly three newly manufactured M-380's from Blue Bird.  Upon delivery of these three units, Texas Motor inspected the units.  Texas Motor claims that the units were not "new," and that the units had structural cracks in the sidewalls, old tires, old coach and swollen chassis batteries, engine rust, electrical malfunctions with short circuits and inoperable slide rooms.  Later additional defects and/or issues with these units were discovered, at least one of which was an unacceptable driving hazard.  Texas Motor never accepted delivery of these units and returned them to Blue Bird.  Texas Motor was informed by potential purchasers that the very units that had been delivered were in fact"old" models.

Two customers relayed information that they owned similar M-380 units that had been returned to the plant for repairs to the sidewalls.  The three units were returned to Blue Bird approximately 72 hours after notification to Blue Bird by Texas Motor of their non-acceptance.

Texas Motor learned, after experiencing these  difficulties that these were not isolated issues. Texas Motor also learned, after entering the franchise agreement, that, as of February 2004, Blue

3

Bird had not produced a coach in several months.  Texas Motor claims it requested Blue Bird's

production schedule prior to placing the initial order, which request was ignored.  It is Texas Motor's

belief that this failure to disclose the lack of current production was Blue Bird's ruse to cause

Plaintiff to enter the franchise dealership agreement.  Had this information been disclosed to

Plaintiff, it would not have signed the franchise dealership agreement.  Further, Blue Bird failed to

disclose that newly manufactured units would not be sent to Texas Motor.  Again, it is Texas

Motor's belief that this failure to disclose was committed with the express intention to cause Texas

Motor to sign the franchise dealership agreement.  Blue Bird also failed to disclose that the

manufacturing quality would be substandard and dangerous to the owner of the unit.  It was  Texas

Motor's belief that this failure to disclose was performed with the express intention to cause Texas

Motor to enter the dealership agreement.  By entering into the agreement, Texas Motor lost profits,

and Retherford lost  the improvements placed upon the separate legal entity's real property which

reverted on the close of the dealership.

As expected, Blue Bird denies these allegations and gives its own version of the facts.  Blue

Bird contends that in March 2002, Texas Motor began corresponding with Blue Bird regarding the

possibility of opening a Blue Bird dealership in Denton, Texas.  Shortly thereafter, the parties had

a meeting at the location that Plaintiffs proposed as the possible site for a Blue Bird dealership.

Texas Motor did not meet with Blue Bird again until sometime in July 2003.  At that 2003 meeting,

Blue Bird's representative indicated that they were interested in Texas Motor as a possible dealer.

After that meeting,  Bill Retherford incorporated Texas Motor as a limited liability company

on or about July 10, 2003.  On or about October of 2003, Blue Bird representatives  met again with

Texas Motor.  An attorney, who was Bill Retherford's brother, along with Bill Retherford's father,

Norman Retherford, reviewed the dealership contract for Texas Motor.  Bill Retherford signed the dealership contract on behalf of Texas Motor on December 9, 2003 and mailed the contract back to Blue Bird.  Blue Bird's representative, Wayne R. Joseph, signed the contract on December 10, 2003.

On or about January 10, 2004, Texas Motor received the appropriate license from the Texas Department of Transportation to sell Blue Bird products in the state of Texas.  On or about January 16, 2004, Blue Bird delivered three M-380 motor homes to Texas Motor.  After the motor homes arrived, Texas Motor allegedly experienced problems with the vehicles including side wall cracks and electrical problems.  Texas Motor also learned that Blue Bird had temporarily suspended producing the M-380 motor homes.  Blue Bird sent a technician to  help resolve electrical problems.  After Blue Bird's technician worked on the coaches, Bill Retherford agreed that all of the alleged repairable problems with the coaches had been resolved, except for the side wall cracks.  Blue Bird offered to  pick up the coaches and fix the side wall cracks at the factory.  However, rather than allow Blue Bird to complete the repairs, Texas Motor decided that they could not sell Blue Bird products.  Texas Motor closed its doors and dismissed all of its employees on or about February 1, 2004.  At the beginning of February of 2004, Texas Motor requested that Blue Bird pick up the motor homes.  On or about February 17, 2005, Blue Bird sent Texas Motor a letter notifying them that the dealership contract would be terminated as a result of Texas Motor's ceasing operations.

Texas Motor filed a complaint against Blue Bird with the Texas Department of Transportation.  Among other claims, Texas Motor alleged that Blue Bird had violated Texas Occupations Code sections 2301.402 and 2301.404 by failing to reimburse Texas Motor for warranty work.  However, Texas Motor later dismissed that complaint with prejudice. All parties agree that there was a valid enforceable franchise agreement.

## Standard of Review

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id.*  The moving party bears the burden of pointing to an absence of evidence to support the nonmoving party's case, and summary judgment will be granted where the nonmovant is unable to point to any evidence in the record that would sustain a finding in the nonmovant's favor on any issue on which he bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24. Moreover, all facts and inferences must be viewed in the light most favorable to the nonmoving party. *See Perez v. United States*, 312 F.3d 191, 194 (5th Cir. 2002).

## Breach of Contract

Texas Motor claims that Blue Bird breached its contract by not shipping new Model 380 motor homes.  Texas Motor also claims that the homes received were not newly manufactured and had structural cracks, old tires and batteries, and electrical problems.   Paragraph 3 of the contract incorporates Blue Bird's obligations  under the agreement.  Nothing in the contract dictates that the coaches have to be model 2002 or 2003 coaches.  In fact, the agreement allows Blue Bird to "accept or reject orders for Agreed Products submitted by Dealer," and   "schedule and reschedule its production and allocate its products as Blue Bird sees fit in its sole judgment ."  The delivery receipts do not specify a model year for the delivered coaches--only mileage at delivery.  Texas Motor argues that one or more of the coaches were not new in that they came from other dealers.  There can be no breach where the contract gives Blue Bird the right to do what it did; i.e., to allocate products at its

6

sole discretion. *See generally C.H. Leavell & Co. v. The Leavell Co.*, 676 S.W.2d 693, 700 (Tex. App.--El Paso, 1984, writ dism'd by agr.); *Knight Indus., Inc. v. Turner Mktg, Inc*. 276 S.E.2d 860, 862 (1981).[1]   Texas Motor fails to articulate in its complaint or response how the contract was breached other than its argument that the coaches were not "new" and that Texas Motor was required to sell defective units to customers.  Texas Motor points to its obligation under paragraph 4.1 of the agreement as evidence that the agreement contemplated only new vehicles. However, the agreement states that the dealer will stock new vehicles subject to availability.  Texas Motor does not argue that the vehicles were used, only that the coaches came from other dealers and not off the assembly line. There is no requirement in the contract for assembly line delivery.  Moreover, Mr. Retherford signed no contract in his individual capacity with Blue Bird.  The contract is between the two companies, and he may not recover for breach of contract since he is not a party to the contract.

As to the coaches delivered, Blue Bird limited its liability arising out of defects to the cost of correcting the defect or replacing the defective part, whichever is less. There is no evidence before the Court as to what the costs of repair were.  Parties can limit contractual liability.  In the absence of a controlling public policy to the contrary, contracting parties can limit their liability in damages to a specified amount. *Fox Elec. Co. v. Tone Guard Sec., Inc.*, 861 S.W.2d 79, 82-83 (Tex. App.–Fort Worth 1993, no writ).  Texas Motor does not argue that the contract was unconscionable. The contract also excludes incidental and consequential damages arising out of any breach of the agreement or any termination of relationship between the parties. Paragraph 28 also provides that

---

[1]The Dealership Contract, Paragraph 20, provides that the contract is governed by Georgia law.  However, this choice of law provision has no bearing on this case as Texas law is the same as Georgia law regarding breach of contract. *See Cline v. Lee*, 581 S.E.2d 558, 562 (2003); *Budget Rent-A-Car of Atlanta, Inc. v. Webb*, 469 S.E.2d 712, 713 (1996).

neither party shall be liable to the other for damages of any kind by reason of termination of the dealership.  Blue Bird also excluded incidental and consequential damages for breach of the implied warranties of merchantability or fitness.  A close review of the contract reveals that there is no pleading or evidence that indicates Blue Bird has failed to comply with its contractual representations set forth in paragraph 3 of the contract or, for that matter, anywhere else within the contract.  Blue Bird's request for summary judgment on this ground is granted.

## DTPA

Both Texas Motor and Retherford have sued for damages under the Texas Deceptive Trade Practices Act.  TEX. BUS. & COM. CODE ANN. § 17.01, *et seq.*  Under the DTPA, a consumer is defined in part as an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services.  TEX. BUS. & COM. CODE ANN. § 1745(4) (Vernon 2004). The Act also defines a business consumer as an individual , partnership, or corporation who seeks or acquires, by purchase or lease, any goods or services for commercial or business use. TEX. BUS. & COM. CODE ANN. § 1745(10).  The definition of goods includes motor homes. TEX. BUS. & COM. CODE ANN.§ 1745(1).  Texas Motor is a business consumer as defined in the Act.  However, Retherford is not a consumer as defined by the Act.  Only the corporation sought to acquire goods.  Therefore, Retherford has no standing to sue.  Section 17.49(f) also provides that the Act does not apply when the claim arises out of a written contract, the contract relates to a transaction involving total consideration of more than $100,000, the consumer is represented by legal counsel, and the contract does not involve the consumer's residence.  The Court finds that this section excludes Texas Motor from obtaining relief under the act.  Moreover, section 17.49(g) provides that the Act does not apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same

project, involving total consideration by the consumer of more than $500,000.  The contract assumed delivery of three M-380 coaches.  According to the Retherford's testimony, the total consideration would be in excess of $200,000 each.  Therefore, the Court finds that Texas Motor has no avenue for relief pursuant to this section, as well. Blue Bird's motion for summary judgment as to DTPA is granted.

### Negligent Misrepresentation and Fraud

Texas Motor has also sued for negligent misrepresentation. To recover on an action for negligent misrepresentation, a party must prove: (1) a representation was made by the defendant in the course of business or in a transaction in which it has a pecuniary interest, (2) that the defendant supplied false information for the guidance of others in their business, (3) that the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) that the plaintiff suffered pecuniary loss by justifiably relying on the defendant's representation.  *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 706 n. 24 (Tex. 2003).  However, the sort of false information contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.–Houston [14th Dist] 1999, pet. denied).

A promise to act in the future constitutes fraud only when made with the intention, design and purpose of deceiving--a promise made with no intention of performing the act.  *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *see Formosa*, 960 S.W.2d at 47-48; *T.O Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992).  Although a party's intent to defraud is determined at the time the party made the representation, it may be inferred from the

party's subsequent acts after the representation is made.  *Anderson, Greenwood Co. v. Martin*, 44 S.W.3d 200, 215 (Tex. App.--Houston [14th Dist.] 2001, pet. denied).

Texas law has long imposed a duty not to induce another to enter into a contract through the use of fraudulent misrepresentations.  *Formosa*, 960 S.W.2d at 46.  This legal duty is separate and independent from the duties established by the contract itself; a party is not bound by a contract procured by fraud.  A cause of action for fraud requires proof of "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, *which was relied upon,* and which caused injury." *Id.* at 47 (quoting *Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex.1994)) (emphasis added).

In addition to Texas Motor's complaints with the coaches, Texas Motor also contends that representations were made before signing the franchise agreement that a new factory had been built; new engineers hired, new production methods would be employed, no school bus chassis would be built, and that ISO 9000 standards would be met. Other representations concerning dealer relations and training were also made.  Causes of action for fraud and negligent misrepresentation require proof of reliance.  *See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 929-30 (Tex.1996) (fraud); *Fed. Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (negligent misrepresentation).

Generally, a party may not assert a claim based upon tort when the only duty at issue arises from a contract.  *Robles  v. Consolidated Graphics, Inc.,* 965 S.W.2d 552, 559-60 (Tex.App.-Houston [14th Dist.] 1997, pet. denied).  In *Sw. Bell Tel. Co. v. Delanney*, 809 S.W.2d 493 (Tex. 1991), the Texas Supreme Court held that a cause of action for "negligence" could not be based on

an allegation that a party failed to perform duties subsumed in a contract because such an action sounded in contract and not tort. *Id.* at 494-95; *see also Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13-14 (Tex. 1996) (extending *Delanney* to hold that nonperformance of contract not actionable under DTPA).  Subsequently, in *Formosa*, 960 S.W.2d at 46-47 the supreme court rejected the application of *Delanney* to preclude a fraudulent-inducement claim.  The court noted that Texas law has long imposed a tort duty, independent of any contract, to abstain from inducing another to enter into a contract through the use of fraud. *Formosa*, 960 S.W.2d at 46. (citing *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) and *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957).  It likewise noted that it had "repeatedly recognized that a fraud claim could be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed in a contract." *Id.* (citing *Crim Truck and Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992).  It also established that tort damages are not precluded simply because a fraudulent representation causes only an economic loss.  *Id.* at 47. "Accordingly," the supreme court held, "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id*. As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992).  An exception to the general rule arises if a party enters into a contract with no intention of performing; that misrepresentation may give rise to a claim of fraud.  *Id.*

Blue Bird contends that the contractual merger clause negates the required showing of reliance. Within the merger clause of the contract, the parties represent that there are no other

11

agreements or understandings other than those contained in the agreement.  The parties also agree that the contract cancels and supersedes all prior contracts between the parties.  Paragraph 26 of the contract provides as follows:

> Entire Agreement: This Contract represents and incorporates the entire understanding of the parties hereto.  There are no representations, inducements, side-agreements or understandings except as expressly set forth in this Contract.  No person is authorized by Blue Bird to make any such additional representations, inducements, or side-agreements.  And terms or conditions stated in any order submitted by Dealer or accepted by Blue Bird that contradict the terms of this Contract shall be null and void. This Contract cancels and supersedes all prior contracts between the parties.

The merger clause in the contract is outcome determinative of whether Texas Motor can withstand Blue Bird's Motion for summary judgment on the tort claims.  The Court finds that although Retherford was not a party to the contract, he was no "stranger" to the contract and is bound by whatever effect the merger clause may have on the ultimate outcome of this case. *See Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 2005 WL 2615049; *Kingsberry v. Phillips Petroleum Co.*, 315 S.W. 2d 561 (Tex. Civ. App. -Austin, 1958, writ ref.d n.r.e.).

A "merger clause" is "[a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document." BLACK'S LAW DICTIONARY 989 (6th ed.1990); *see generally IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113 (Tex. App.-- Houston [14th Dist.] 2003, pet denied).  A merger clause freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain.  *SeePrudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156, 162 (Tex.1995) (using same criteria to establish enforceability of "as is" clause in agreement).

12

*IKON*, 125 S.W.3d at 126.  In *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566 (5ᵗʰ Cir. 2003) the agreement provided that "This Agreement shall constitute the entire contract between the parties and supercedes all existing agreements between them, whether oral or written, with respect to the subject matter hereof."  The court found that although the language, standing alone, did not specifically refer to prior representations,  when considered with the contract as a whole, there  was an  unequivocal disclaimer of reliance.  The Court finds that the language here is more unequivocal in its intent to disclaim reliance than that noted by the Fifth Circuit in *Armstrong.* There are no representations except as expressly set forth in the agreement.  No one is authorized by Blue Bird to make additional representations.  In *Schlumber Technology Corporation v. Swanson*, 959 S.W.2d 171 (Tex.  1997), the Texas Supreme Court analyzed certain factors in determining whether a merger clause should effectively prevent reliance. Among the factors considered was whether counsel represented the parties, whether the agreement was negotiated at arm's length, and whether the parties were sophisticated  business individuals.

According to the evidence submitted herein, the above factors support Blue Bird's claim that the merger clause negates reliance.  Texas Motor argues that, since the merger clause does not mention prior representations, such are not excluded.  However, the agreement specifically excludes representations except as set forth in the contract.   Any representations would have to be representations made prior to the contract formation.  Texas Motor's pleadings weaken any claim for reliance.  As Texas Motor pointed out in its original complaint, it was aware that the motor home line had deteriorated.  Texas Motor alleges that before it entered into the franchise agreement, it was aware that there were changes in the way the units were constructed; and that it was "cautious in [its] commitment due to this decline."  Texas Motor even admits that the prototype shown it had defects,

13

but that it thought such issues would be addressed in the production of the final product, although it is not clear how such representations were made and by whom.  Texas Motor even considered and sought alternatives to the very franchise agreement entered into by the parties.

The Court finds that the merger clause bars reliance and that Plaintiffs cannot recover for fraud or negligent misrepresentation.  The language of the merger clause specifically states that there are no representations or inducements except as set forth in the contract.  The parties were sophisticated business persons represented by counsel.  If the prior representations were an inducement for entering into the agreement, Plaintiffs should have so specified.  This was not a form contract with boiler plate language.  Summary Judgment should be granted for Defendant on all claims.

## RECOMMENDATION

Based upon the foregoing, the Court recommends that Defendant's Motion for Summary Judgment be, in all respects GRANTED and that the above titled and numbered cause of action be DISMISSED WITH PREJUDICE.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.  28 U.S.C.A.  § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest

14

injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 21st day of November, 2005.**

_____

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE